UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNA FOSTER,

Case. No. 15-11368

         Plaintiff,

District Judge Matthew F. Leitman
Magistrate Judge R. Steven Whalen

v.

COMMISSIONER OF
SOCIAL SECURITY,

         Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Donna Foster ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Dock. #18] be GRANTED and that Plaintiff's Motion for Summary Judgment [Dock. #14] be DENIED.

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on July 21, 2009, alleging disability as of November 15, 2008 (Tr. 123, 130). Upon initial denial of the claim, Plaintiff requested an

administrative hearing, held on June 7, 2011 in Flint, Michigan before Administrative Law Judge ("ALJ") Andrew G. Sloss (Tr. 22).   Plaintiff, unrepresented, testified (Tr. 26-30), as did Vocational Expert ("VE") Stephanie Leech (Tr. 30-33).  On June 20, 2011, ALJ Sloss found that Plaintiff was not disabled (Tr. 8-17).   On December 14, 2011, the Appeals Council declined to review the administrative decision (Tr. 1-3).  On February 10, 2012, Plaintiff filed suit in this Court.  On March 27, 2013, the Honorable Lawrence P. Zatkoff adopted my recommendation to remand the case under sentence four of 42 U.S.C. § 405(g) for further fact-finding on the basis that the medical transcript did not contain all of the psychological treating records and that the VE's job findings did not reflect Plaintiff's full degree of psychological limitation (Tr. 670-689).  *Case No. 12-11368, Docket #14-15.*

ALJ Kathleen Eiler held a second hearing on March 11, 2014 (Tr. 605-34).   Plaintiff (represented by attorney John Wildeboer) and VE Kenneth Browde testified (Tr. 609-630, 630-633).  On May 2, 2014, ALJ Eiler found Plaintiff not disabled (Tr. 597-598).   On February 26, 2015, the Appeals Council declined to review the administrative decision (Tr. 486-491).  Plaintiff filed the present action in this Court on April 14, 2015.

## II.  BACKGROUND FACTS

 Plaintiff, born September 2, 1962, was 51 at the time of the latest administrative decision (Tr. 123, 598).  She left school in ninth grade (Tr. 185) and worked previously as a general laborer,  fast food worker, and as a presser for a dry cleaner (Tr. 182).  Her application for benefits alleges disability as a result of depression, stress, an ovarian cyst,

migraines, and anemia (Tr. 181).

### A. Plaintiff's Testimony (March 11, 2014 Hearing)

Plaintiff offered the following testimony:

She lived in Saginaw, Michigan with her mother (Tr. 609).  Her mother had dementia and was cared for by home health aides (Tr. 609).  Plaintiff was unable to care for her mother due to the medication side effect of fatigue (Tr. 611).  She took Seroquel for sleep disturbances (Tr. 611).  Plaintiff experienced migraine headaches, stomach problems, depression, and anxiety (Tr. 611).  On occasion, she required emergency treatment for migraines but was usually able to take medication and then "sleep" them off (Tr. 611-613). The migraines lasted around three days and sometimes caused nausea (Tr. 612-614).

Plaintiff experienced constipation, accompanied by bloating and abdominal pain (Tr. 614).  In 2008 and 2009, she experienced significant hemorrhaging due to uterine fibroids and underwent a hysterectomy in February, 2011 (Tr. 615-616).  The loss of blood due to hemorrhaging prior to the hysterectomy weakened her to the point where she would "lay in bed all day" (Tr. 616).

Plaintiff's current health plan allowed her to see a psychological counseler six times a year, but she had kept only four appointments in the previous year due to transportation problems (Tr. 617).  Her psychological counseler tried to obtain additional appointments (Tr. 618).  Despite taking Seroquel and Tramadol, she was still depressed (Tr. 618).  Her depression was characterized by weekly crying jags and agitation (Tr. 619).  The agitation

-3-

caused sleep disturbances (Tr. 619). She spent most of her time indoors and grocery shopped only once a month (Tr. 620). She experienced nervousness in public places and spent most of the day watching television in her room (Tr. 621). She spoke with her daughter by telephone approximately three times a week (Tr. 622). Since the hysterectomy, Plaintiff had gained weight and experienced abdominal bloating (Tr. 622). She experienced shortness of breath climbing the stairs (Tr. 623).

Plaintiff was able to care for her mother, albeit with difficulty, before the aides began coming to the house about one year before the hearing (Tr. 623). She sought emergency treatment for a number of conditions such as stomach and dental problems because she lived across the street from a hospital (Tr. 624). She previously held a driver's license but it had been suspended for unpaid traffic tickets (Tr. 624). She was able to access van transportation for her other medical appointments (tr. 624). She had not attended church since 2011 (Tr. 625). Plaintiff had not used alcohol in the past year (Tr. 626). She did not receive medical or psychological care between August, 2006 to May, 2008 because she had recently moved to Michigan and did not know where to obtain treatment (Tr. 627).

In response to questioning by her attorney, Plaintiff reported that her sister and/or her brother's girlfriend helped Plaintiff's mother before the aides began visiting the house (Tr. 628). She testified that she drank in the past to cope with the migraine headaches (Tr. 629).

-4-

### B. The Medical Records[1]

#### 1. Records Related to Plaintiff's Treatment

In July, 2005, Plaintiff attempted suicide (Tr. 282, 284, 333). She was assigned a GAF of 50 and diagnosed with a substance abuse disorder (alcohol) and major depression[2] (Tr. 285, 334). In October, 2005, Plaintiff sought mental health treatment (Tr. 239-240). She was diagnosed with major depression and continued therapeutic trials of Lexapro and Seroquel (Tr. 240, 285). Plaintiff denied physical problems, but reported changes in sleep patterns (Tr. 243). She was assigned a GAF of 55[3] (Tr. 244). In March, 2006, Plaintiff reported a decrease in psychological symptoms but complained of continued depression and stress as a result of the impending death of her brother (Tr. 251). In May, 2006, Plaintiff reported increased difficulty sleeping (Tr. 274). In June, 2008, Plaintiff reported heavy menses for the past two months (Tr. 870). Treating notes for a tooth ache from the following month note a normal mood and affect (Tr. 875, 1106).

In January, 2009, Plaintiff sought emergency treatment for throat pain (Tr. 427). She

---

[1]Conditions unrelated to the disability claim as well as records predating the alleged onset date of November 15, 2008 by more than one year, while reviewed in full, are discussed only for background purposes.

[2]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV-TR* ), 34 (4th ed.2000)

[3]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 34.

appeared fully oriented (Tr. 426-428).  In May, 2009, Plaintiff received emergency treatment for chest pain (Tr. 431).  The same month, she received emergency treatment for vaginal bleeding (Tr. 422).  Treating notes state that she did not appear anxious or depressed (Tr. 432).  She admitted smoking one pack of cigarettes each day and drinking two to three cans of beer weekly (Tr. 432).  Janes Street Academic Community Health Center treating records from the following month show that Plaintiff continued to experience depression and insomnia (Tr. 456).  She was given samples of Seroquel (Tr. 455).

In July, 2009, Plaintiff reported continued anxiety, panic attacks, mood swings, and depression (Tr. 811).  Her depression was characterized as "recurrent" and "mild" (Tr. 811, 1153).  Psychological intake records state that Plaintiff experienced stress living with her mother, an alcoholic, and a sister who smoked crack cocaine (Tr. 918).  Plaintiff reported independence in self-care and financial matters (Tr. 919).  She reported abdominal bloating (Tr. 879, 1110).  She exhibited normal speech, perceptions, and thought processes (Tr. 921).  In August, 2009, Plaintiff was informed by Janes Street staff that she would be required to make an appointment with a psychologist to obtain Lexapro (Tr. 452, 811, 1111).  Psychological treating records state that Plaintiff reported "isolating in her room to avoid [her mother and sister's intoxication and violence" (Tr. 1163).  October, 2009 records state that the condition of bipolar disorder was stable (Tr. 882, 1113).  Plaintiff was encouraged to make social contacts outside of the home (Tr. 1170).  November, 2009 treating records state that Plaintiff experienced continued depression and anxiety characterized by "panic attacks

sometimes at work . . ." (Tr. 812). She expressed her love of her grandchildren and expressed the desire to take college courses (Tr. 931). She reported that "anxiety and depression" kept her from leaving the house (Tr. 1173). Records from later the same month note a normal affect (Tr. 1175). Plaintiff attributed her psychological problems to her mother and sister (Tr. 1175). Treating notes from the following month note a history of migraines (Tr. 887).

January 10, 2010 records state that Plaintiff was discharged from therapy after completing the six sessions allowed by her health care plan (Tr. 812). Medical notes from the following month state that the bipolar disorder was stable (Tr. 1117). October, 2010 treating records state that Plaintiff required blood transfusions for excessive menstrual bleeding (Tr. 890, 894, 1096-1097).

In February, 2011, Plaintiff underwent a hysterectomy without complications (Tr. 472-478, 907, 1125). In January, 2012, Plaintiff requested a higher dose of Seroquel (Tr. 1028). February, 2012 psychological records state that Plaintiff had been crying "uncontrollabl[y]" for one month and experienced stress being a "chore provider" for her mother (Tr. 800, 810, 939). Plaintiff reported independence in meal preparation, shopping, money management, and non-medical care (Tr. 808, 942, 1191). March, 2012 medical records state that Plaintiff denied headaches (Tr. 1031). The same month, Plaintiff reported fatigue from having to take care of her mother, but noted that she was applying for assistance from home health aides for her mother (Tr. 1206). April, 2012 therapy discharge notes state that Plaintiff "completed

her goals successfully" and did not request further service (Tr. 802, 966). She reported that she had been able to set boundaries with her mother and that her depression had lessened (Tr. 1212). In June, 2012, Plaintiff sought emergency treatment for a migraine headache with nausea and light sensitivity (Tr. 970). In October, 2012, Plaintiff sought emergency treatment for a gastrointestinal condition (Tr. 975). Treating sources noted a normal affect and orientation (Tr. 975).

January, 2013 medical records state that Plaintiff experienced the conditions of Gastroesophageal Reflux Disease ("GERD"), migraines, and a mood disorder (Tr. 1048). She exhibited intact judgment with a slightly flat mood and affect (Tr. 1048). The same month, she sought emergency treatment, reporting migraines for the past three days (Tr. 1136). She exhibited a normal mood and affect (Tr. 1138). Emergency room notes from April, 2013 state that Plaintiff was "negative" for psychiatric symptoms and denied any symptomology (Tr. 979, 1055-1056). Emergency records from the following month and July, 2013 also note a normal mood and affect (Tr. 984, 991).

Plaintiff resumed therapy in September, 2013 (Tr. 793, 1222). She reported independence in self-care, meal preparation, shopping, and money management (Tr. 1236). A summary of Plaintiff's treatment from the next month states that her primary diagnosis was bipolar I with a recent episode of mild depression (Tr. 792). The same month, Plaintiff sought emergency treatment for a headache (Tr. 995). Medical records note a stable mood (Tr. 1065). Plaintiff reported that she continued to take care of her mother but left the house

-8-

to go to church (Tr. 1243).  The following month, Plaintiff reported that a toothache was causing headaches (Tr. 998).  She exhibited a normal affect and mood (Tr. 1002).  Plaintiff admitted to smoking a half pack of cigarettes a day (Tr. 1005).  At CT of the head taken later the same month was unremarkable (Tr. 1011).  Plaintiff sought emergency treatment for abdominal bloat in January, 2014 (Tr. 1013).  Laboratory and imaging tests were negative for significant abnormalities (Tr. 1013-1014, 1016, 1145).  Medical records note "no depression, anxiety, or agitation" (Tr. 1075, 1145).

### 2.  Non-Treating Sources

 In April, 2006, Debra C. Price completed a non-examining Psychiatric Review Technique, finding the presence of an affective disorder and substance abuse disorders (Tr. 255, 258,263).  She found that Plaintiff experienced moderate restrictions in daily living, social functioning, and concentration, persistence, or pace (Tr. 265).  Dr. Price also completed a Mental Residual Functional Capacity Assessment, finding moderate limitations in the ability to understand, remember, and carry out detailed instructions; maintain concentration for extended periods; interact appropriately with the general public; and set realistic goals (Tr. 270).  Dr. Price found Plaintiff's claims credible but noted that "due to social avoidance, she would be best suited for a work setting with limited public contact" (Tr. 271).

In June, 2006, consultive examination notes state that Plaintiff reported insomnia, anemia, and depression (Tr. 278).  She also reported one suicide attempt in the previous year

(Tr. 278). A physical exam was unremarkable, but Plaintiff exhibited "some mannerisms consistent with anxiety" (Tr. 280). A Psychiatric Review Technique and Mental Residual Functional Capacity, performed in August, 2006, found identical limitations to those found by Dr. Price two months earlier (Tr. 265, 270-271, 302, 306-307).

In October, 2009, psychologist Bruce Fowler, Psy.D. conducted an examination on behalf of the SSA (Tr. 465-471). Plaintiff reported that one brother had died from a drug overdose and that her mother and sister were currently "doing drugs" (Tr. 465). She reported that she worked at Burger King "three or four months" before the hearing, but that the work was limited to "four hours a day, once a month" (Tr. 465). Plaintiff stated that she stopped working after experiencing an anxiety attack at work (Tr. 465). She reported taking Seroquel for sleep, Lexapro for anxiety and depression, and Tylenol P.M. for headaches (Tr. 466). She dropped out of school in the ninth grade after her mother left town (Tr. 466). Plaintiff reported that she had no friends and "very difficult relationships" with her mother and twin sister with whom she currently lived (Tr. 466). Dr. Fowler observed that it was "moderately difficult to establish rapport" with Plaintiff (Tr. 467). Plaintiff appeared mildly anxious with a normal affect (Tr. 467). She denied psychiatric treatment directly following her July, 2005 suicide attempt (Tr. 467). She reported that she had been experiencing a migraine headache for the past three days (Tr. 468-469). Dr. Fowler assigned Plaintiff a GAF of 45 with a "guarded to fair" prognosis (Tr. 469). He recommended that Plaintiff "remain in psychotherapy and continue to receive psychotropic medication" (Tr. 469). He found that

-10-

Plaintiff's anxiety and depression "clearly interfere[d] with her ability to perform any job on a consistent and reliable basis (Tr. 469). He determined that Plaintiff could manage her benefits "with assistance" (Tr. 469).

In October, 2013, Mark Zaroff, Ph.D. performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report of depression, characterized by lack of motivation, crying jags, and sleep disturbances (Tr. 826). Plaintiff admitted to former alcohol abuse (Tr. 827). Dr. Zaroff noted that Plaintiff was fully oriented with good immediate and past memory but poor recent memory (Tr. 829). He found that Plaintiff had a "poor" prognosis due to "poor attention and concentration" that would impact her work abilities in a "typical work setting" (Tr. 830). He assigned her a GAF of 48 (Tr. 830).

### 3. Record Created After the May 2, 2014 Administrative Decision[4]

May 12, 2014 emergency room records note Plaintiff's report of intermittent suicidal ideation but no plans to harm herself (Tr. 558-559). She reported that taking care of her mother created stress (Tr. 558). A May 21, 2014 psychological evaluation states that

---

[4]

The Appeals Council declined to add these records to the medical exhibits because they were created after administrative decision and thus presumptively irrelevant to Plaintiff's condition as of May 2, 2014 (Tr. 486-487). (Tr. 2). *Sizemore v. Sec'y of Health & Human Servs.,* 825 F.2d 709, 712 (6th Cir.1988)(where a claimant's condition has worsened since the administrative decision, the proper remedy is to initiate a new claim for benefits).

The Court concludes that the newer records do not form a basis for remand of the present case. 42 U.S.C. 405(g). While the earliest post-decision records refer to Plaintiff's condition as early as two weeks after the decision (Tr. 494), they do not provide additional insight into her condition on or before May 2, 2014.

Plaintiff experienced ongoing depression but denied suicidal ideation (Tr. 553).  She did not exhibit psychotic symptoms (Tr. 553).  May 30, 2014 psychological intake records state that Plaintiff reported that she was "constantly fatigued, lethargic, listless, bored and despondent" and experienced concentrational problems (Tr. 494, 526).  The intake records note appropriate dress and adequate grooming (Tr. 497).  Plaintiff exhibited normal speech, an organized thought process, full orientation, intact memory, and good concentration (Tr. 498-499).  The following month, Plaintiff reported continued anxiety, but denied hallucinations (Tr. 502, 539).  She denied medication side effects (Tr. 502).  July, 2014 treating records note better moods and "pretty good" sleep (Tr. 508).  She denied suicidal thoughts (Tr. 508).

### C.  Vocational Testimony (March 11, 2014 Hearing)

VE Browde classified Plaintiff's past relevant work as fast food worker as exertionally light[5] and unskilled; and industrial cleaner, light/unskilled (Tr. 630-631).  The ALJ then described a hypothetical individual of Plaintiff's age, education, and work experience with the following limitations:

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

[A]ssume this person has no exertional limitations, however, she can never climb ladders, ropes or scaffolds, but is unlimited in other postural positions. She must avoid [concentrated] exposure to temperature extremes, and avoid all exposure to workplace hazards. She can perform simple, routine, repetitive tasks in a routine work setting, and no production rate pace work. She cannot be responsible for complex decision-making in the workplace. She can engage in occasional interaction with supervisors but cannot interact with coworkers or the general public. Could this person perform any of the claimant's past work? (Tr. 631).

The VE responded that the individual could perform Plaintiff's past relevant work as an industrial cleaner but that the limitations would preclude the fast food work (Tr. 631). He found that the hypothetical limitations would also allow for the exertionally medium, unskilled work of a hand packager (58,000 positions in the national economy); the exertionally light, unskilled work of a housekeeping cleaner (163,000); medium, unskilled work of a hospital cleaner (42,000) (Tr. 632). The VE testified that if the hospital cleaner position were limited to the third shift, the job numbers would be reduced to 12,000 (Tr. 632-633). The VE found that if the above-described individual were also limited by the need to be "off task at least 15 percent of each workday," all work would be precluded (Tr. 633). In response to questioning by Plaintiff's attorney, the VE testified that if the same individual had at least two unscheduled absences each month due to "abdominal pain, weakness, migraine headache, and other conditions," all work would be precluded (Tr. 633).

### D. The ALJ's Decision (May 2, 2014)

Citing the medical records, ALJ Eiler found that Plaintiff experienced the severe impairments of "migraine headaches, anemia, an affective disorder, an anxiety disorder, and

-13-

a substance abuse disorder" but that none of the conditions met or medically equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 576, 578). The ALJ found that Plaintiff had moderate limitation in activities of daily living, social functioning, and concentration, persistence, and pace (Tr. 579-581). The ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") for work at all exertional levels with the following additional limitations:

> [S]he can never climb ladders, ropes, or scaffolds, but is unlimited in other postural positions. She must avoid concentrated exposure to temperature extremes and avoid all exposure to workplace hazards. She can perform simple, routine, and repetitive tasks with minimal changes in a routine work setting and no production rate pace work. She cannot be responsible for complex decision-making in the workplace. She can engage in occasional interaction with supervisors, but cannot interact with coworkers or the general public (Tr. 582).

Citing the VE's testimony, the ALJ determined that while Plaintiff was unable to perform any of her past relevant work, she could work as a hand packager, housekeeping cleaner, and hospital cleaner (Tr. 596-597).

The ALJ discounted Plaintiff alleged degree of limitation (Tr. 590-592). She noted that Plaintiff did not seek regular treatment for migraines between December, 2009 and October, 2011 (Tr. 590). She noted that Plaintiff's mental status evaluations at the time of emergency treatment for various conditions were unremarkable (Tr. 590). The ALJ also noted that SSA field office employees observed no cognitive or communicative difficulties during telephone interviews (Tr. 595). She noted that Plaintiff was able to work part time at the time of the 2009 application for benefits, denied problems in self care activities, and

-14-

could shop, perform laundry chores, and clean without assistance (Tr. 591).

The ALJ discounted Dr. Fowler's October, 2009 "poor" prognosis, noting that the one-time source did not find intellectual deficits or problems in self-care activities (Tr. 593-594). The ALJ likewise discounted Dr. Zaroff's October, 2013 "poor" prognosis, noting Dr. Zaroff's finding that Plaintiff's poor performance "may have been affected by her noncompliance with medication" (Tr. 594). She also noted that Dr. Zaroff over-relied on Plaintiff's subjective account of symptomology and limitation (Tr. 594).

### III.    STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the

-15-

administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6ᵗʰ Cir. 1989).

### IV.    FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

### V.  ANALYSIS

Plaintiff, proceeding *pro se*, has submitted a one-page motion for summary judgment. *Docket #14.*  She reports that since filing for disability, she has experienced additional

-16-

medical problems, noting that she experienced a leg break requiring hardware implantation. *Id.* She alleges that she experiences continued depression, PTSD, and migraines. *Id.* She reports financial difficulties due to her lack of income. *Id.*

After careful review of the latest administrative decision and medical transcript, I find no basis for remand. First, ALJ Eiler's May 2, 2014 opinion corrected the errors I found in the previous administrative opinion, and on which I recommended a remand. *See Case No. 12-11368, Doc.#14-15.* In contrast to the previous opinion, ALJ Eiler accounted for Plaintiff's moderate concentrational limitation by restricting Plaintiff to "simple, routine, repetitive tasks in a routine work setting" with a preclusion on "production rate pace work," "complex decision-making," and "interaction with coworkers with coworkers or the general public" (Tr. 582, 631). ALJ Eiler's choice of hypothetical modifiers sufficiently account for Plaintiff's concentrational limitations (Tr. 580-581). *See Smith–Johnson v. Commissioner of Social Sec.*, 579 Fed. Appx. 426, 437,  2014 WL 4400999, *10 (6th Cir. September 8, 2014)(moderate concentrational limitations adequately addressed by restricting the claimant to unskilled, routine, repetitive work).

In further compliance with the remand order in the previous case, ALJ Eiler addressed Plaintiff's psychological/psychiatric treating records. She cited January, 2012 records showing "normal insight, judgment, and memory, with no signs of depression, anxiety, or agitation" (Tr. 587). The ALJ noted that during emergency treatment for physical complaints, Plaintiff exhibited a normal mood and affect (Tr. 586, 589). The ALJ observed

-17-

that Plaintiff was able to take care of her personal needs, shop, perform household chores, and manage her money (Tr. 591). The ALJ also noted that the claims of limitation were undermined by Plaintiff's ability to care for her mother on a full time basis before procuring the help of home health aides (Tr. 592). She also cited psychological treating records showing that the anxiety and depression arose in large part to family stressors (Tr. 586, 588).

In particular, the ALJ provided multiple reasons for rejecting Dr. Fowler's finding of a "poor" prognosis, noting that the one-time examination was based on Plaintiff's subjective complaints rather than the treating records and activities of daily living reflecting a lesser degree of impairment (Tr. 594). The ALJ also noted that Dr. Fowler's prognosis was contradicted by his own finding of "good hygiene, good contact with reality, spontaneous speech," "no evidence of hallucinations, delusions, or obsessive thoughts," and the ability to perform simple calculations (Tr. 594). As to Plaintiff's allegations of disabling migraines, the ALJ noted that Plaintiff did not require emergency treatment for headaches until June, 2012 and that a November, 2013 CT of the head was negative for abnormalities (Tr. 583). She cited Plaintiff's July, 2009 denial of daily headaches (Tr. 583). The ALJ also noted that Plaintiff did not receive treatment for migraines between December, 2009 and October, 2011 (Tr. 584). She noted that while Plaintiff experienced anemia, the condition improved after the February, 2011 hysterectomy (Tr. 585-586). The ALJ also observed that Plaintiff's report of disabling migraines and anemia was undermined by her ability to take care of her mother and engage in "eight hours of television, gaming, or other electronic activity" on a daily basis

-18-

(Tr. 591).

Moreover, the ALJ's conclusions are consistent with my own review of the transcript. Emergency treatment records for physical conditions show that Plaintiff's mood and affect were consistently unremarkable (Tr. 432, 975, 979, 984, 991, 1002, 1055-1056, 1065, 1075,1138, 1145). Psychological treating records characterize Plaintiff's condition as "mild" and that she exhibited normal speech, perceptions, and thought processes (Tr. 811, 921, 1153). The treating records state repeatedly that Plaintiff was independent in self-care, housework, shopping, and money management (Tr. 808, 919, 942, 1191,1236). The records also indicate that Plaintiff's depression and anxiety were exacerbated by family stressors (mother's dementia and alcoholism; sister's crack cocaine habit; death of brothers) suggesting that Plaintiff's ability to hold employment was hampered in large part by the home situation. Plaintiff herself attributed the mental problems to the stress of living with her mother and sister (Tr. 800, 810, 918, 939, 1163, 1175, 1206). Her report to a treating source that she stayed in her room to avoid dealing with her mother and sister's problems is not fully consistent with her testimony that she stayed in room because of anxiety and depression (Tr. 621, 1163). She admitted that her depression lessened when she was able "to set boundaries" with her mother (Tr. 1212).

The Court has also made note of Plaintiff's statement that since applying for benefits, she broke her leg. *Docket #14.* However, the treating records from 2005 through October, 2014 do not mention treatment for a broken leg. Assuming that Plaintiff broke her leg,

experienced a new medical condition, or had an exacerbation of her other conditions sufficient to show disability after the May 2, 2014 administrative determination, the proper remedy is to file a new application of benefits for the newer period. *See Sizemore, supra,* 825 F.2d at 712 (where a claimant's condition has worsened *after* the administrative decision, the proper remedy is to initiate a new claim for benefits).

My recommendation to uphold the ALJ's decision should not be read to trivialize Plaintiff's conditions for the relevant period, or to discourage her from reapplying for benefits if she believes her condition has worsened. Nonetheless, because the determination that the Plaintiff was not disabled is generously within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## VI.   CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Dock. #18] be GRANTED and that Plaintiff's Motion for Summary Judgment [Dock. #14] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947

-20-

(6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: July 15, 2016

## CERTIFICATE OF SERVICE

I hereby certify on July 15, 2016 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants July 15, 2016.

s/Carolyn M. Ciesla
Case Manager for the
Honorable R. Steven Whalen
